**SIRI & GLIMSTAD LLP**
Mason A. Barney (*pro hac vice* to be filed)
E: mbarney@sirillp.com
Steven D. Cohen (N.J. Bar No. 038172009)
E: scohen@sirillp.com
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091

Thomas Stavola Jr. (N.J. Bar No. 380012022)
E: tstavola@sirillp.com
8 Campus Drive, Suite 105 PMB #161
Parsippany, NJ 07054
Tel: (212) 532-1091

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ALBERT RAGUSEO, ROBERT GRUN, JOSHUA GRUN, ZACHARY GRUN, JILL GRUN, CHRISTINA AIELLO, ALYSSA SBLENDORIO, MIRIAM BELANGER, KAITLIN STROUD, THOMAS SANITATE AND KATELYN GRABINSKY, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CENTRASTATE HEALTHCARE SYSTEMS, INC.,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiffs Albert Raguseo, Robert Grun, Joshua Grun, Zachary Grun, Jill Grun, Christina

Aiello, Alyssa Sblendorio, Miriam Belanger, Kaitlin Stroud, Thomas Sanitate, and Katelyn

Grabinsky, individually and on behalf of the Classes defined below of similarly situated persons ("Plaintiffs"), allege the following against CentraState Healthcare Systems, Inc. ("CentraState" or "Defendant") based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by Plaintiffs' counsel and review of public documents. Pursuant to Local Civil Rule 10.1, the addresses for the parties are as follows:

Albert Raguseo
8 Winnebago Trail
Browns Mills, NJ 08015

Robert Grun, Joshua Grun, Zachary Grun, and Jill Grun
22 Regina Road
Morganville, NJ 07751-1639

Christina Aiello
30 S. Westfield Road
Howell, NJ 07731-2320

Alyssa Sblendorio
3 Timmons Hill Drive
Millstone Township, NJ 08535-9306

Miriam Belanger
330 Shore Drive, Apt. E08
Highlands, NJ 07732

Kaitlin Stroud
151 W. 5th Street
Howell, NJ 07731

Thomas Sanitate
744 Brewers Ridge Road
Jackson, NJ 08527-2021

Katelyn Grabinsky
405 Stamford Square
Englishtown, NJ 07726-1693

CentraState Healthcare Systems, Inc.
901 West Main Street
Freehold, NJ 07728

**INTRODUCTION**

1.     Plaintiffs bring this class action against CentraState for its failure to properly secure and safeguard Plaintiffs' and other similarly-situated patients' names, addresses, Social Security numbers, dates of birth, health insurance information, and other sensitive medical records from hackers.

2.     CentraState, based in Freehold, New Jersey, is a private, not-for-profit health organization established in 1971 that serves New Jersey patients. CentraState includes an acute care hospital, an ambulatory campus, three senior living communities, six family practice offices, OB/GYN services, a residency training program, and a charitable foundation.

3.     On or about February 8, 2023, CentraState sent out data breach letters ("Data Breach Notice" or "Notice") to individuals whose information was compromised as a result of what CentraState referred to as "a ransomware cyberattack."

4.     Based on the Notice sent by CentraState and news reports, on December 29, 2022, CentraState "detected unusual activity involving [its] computer systems." In response, Defendant claims that it initiated an investigation. That investigation determined that on December 29, 2022, an unauthorized person obtained a copy of an archived database that stored CentraState patient information (the "Data Breach").

5.     Information compromised in the Data Breach included highly sensitive data that represents a gold mine for data thieves. This includes names, addresses, Social Security numbers, dates of birth, health insurance information, and other sensitive medical records (collectively, the "Private Information") and includes personally identifiable information ("PII") and protected health information ("PHI") as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") that Defendant collected and maintained.

6.     Armed with the Private Information accessed in the Data Breach and a head start, a data thief could commit a variety of crimes including, *e.g.*, using Class Members' names to obtain medical services, using Class Members' information to obtain government benefits, opening new

financial accounts in Class Members' names, taking out loans in Class Members' names, and filing fraudulent tax returns using Class Members' information.

7.      Therefore, Plaintiffs and Class Members have suffered ascertainable losses in the form of the loss of the benefit of their bargain, out-of-pocket expenses, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

8.      Plaintiffs bring this class action lawsuit to address CentraState's inadequate safeguarding of Class Members' Private Information that it collected and maintained.

9.      The potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to CentraState, and thus it was on notice that failing to take necessary steps to secure the Private Information left that Private Information vulnerable to an attack.

10.      Upon information and belief, Defendant and its employees failed to properly monitor the computer network and systems that housed the Private Information.

11.      Plaintiffs' and Class Members' identities are now at risk because of CentraState's negligent conduct, as the Private Information, PII, and PHI that CentraState collected and maintained is now likely in the hands of data thieves and unauthorized third-parties.

12.      Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed and/or compromised during the Data Breach.

13.      Plaintiffs seek remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to CentraState's data security systems, future annual audits, and adequate credit monitoring services funded by CentraState.

## **PARTIES**

14.      Plaintiff Albert Raguseo is, and at all times mentioned herein was, an individual citizen of the State of New Jersey residing in the City of Browns Mills in Burlington County.

15.      Plaintiff Robert Grun is, and at all times mentioned herein was, an individual citizen of the State of New Jersey residing in the City of Morganville in Monmouth County.

16.    Plaintiff Joshua Grun is, and at all times mentioned herein was, an individual citizen of the State of New Jersey residing in the City of Morganville in Monmouth County.

17.    Plaintiff Zachary Grun is, and at all times mentioned herein was, an individual citizen of the State of New Jersey residing in the City of Morganville in Monmouth County.

18.    Plaintiff Jill Grun is, and at all times mentioned herein was, an individual citizen of the State of New Jersey residing in the City of Morganville in Monmouth County.

19.    Plaintiff Christina Aiello is, and at all times mentioned herein was, an individual citizen of the State of New Jersey residing in the City of Howell in Monmouth County.

20.    Plaintiff Alyssa Sblendorio is, and at all times mentioned herein was, an individual citizen of the State of New Jersey residing in the City of Millstone Township in Monmouth County.

21.    Plaintiff Miriam Belanger is, and at all times mentioned herein was, an individual citizen of the State of New Jersey residing in the City of Highlands in Monmouth County.

22.    Plaintiff Kaitlin Stroud is, and at all times mentioned herein was, an individual citizen of the State of New Jersey residing in the City of Howell in Monmouth County.

23.    Plaintiff Thomas Sanitate is, and at all times mentioned herein was, an individual citizen of the State of New Jersey residing in the City of Jackson in Ocean County.

24.    Plaintiff Katelyn Grabinsky is, and at all times mentioned herein was, an individual citizen of the State of New Jersey residing in the City of Englishtown in Monmouth County.

25.    Defendant CentraState is a private, not-for-profit health organization established in 1971 with its central location in Freehold, New Jersey.

## JURISDICTION AND VENUE

26.    The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is well over 100, some of whom have different citizenship from CentraState. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

27.    This Court has jurisdiction over the Defendant because CentraState operates in and has its principal place of business in this District.

28.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District. CentraState has harmed Class Members residing in this District.

## CENTRASTATE COLLECTS HIGHLY SENSITIVE INFORMATION

29.    CentraState is a private, not-for-profit health organization located in Freehold, New Jersey. Founded in 1971, CentraState includes an acute care hospital, an ambulatory campus, three senior living communities, six family practice offices, OB/GYN services, a residency training program, and a charitable foundation. CentraState employs approximately 1,700 people and generates over $300 million in annual revenue.

30.    As a condition of receiving medical services, CentraState requires that its patients entrust it with highly sensitive PII and PHI. In the ordinary course of receiving services, patients are required to provide sensitive personal and private information such as names, Social Security numbers, dates of birth, addresses, and sensitive medical and health insurance information, among other things.

31.    In its Notice of Privacy Practices, CentraState promises its patients that it is "committed to protecting medical information about you" and says that it is required by law to "[e]nsure that medical information that identifies you is kept private."[1] CentraState also describes in its Privacy Policy the limited specific instances when it shares patient health information and says that it will otherwise share patients' information "only with your written permission."[2] In its

---

[1] *See* CentraState Notice of Privacy Practices, https://www.centrastate.com/hipaa-privacy-practices/ (last visited Feb. 19, 2023).

[2] *Id.*

6

Privacy Policy, CentraState also acknowledges that a data breach "poses a significant risk of financial, reputational, or other such harm."[3]

32.     On information and belief, CentraState provides each of its patients with a copy of its Privacy Policy and requires each to sign an acknowledgment with regard to the Privacy Policy. In doing so, CentraState enters into a binding contract with each of its patients.

33.     CentraState uses Private Information from patients to provide medical and healthcare-related services to patients.

34.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, CentraState assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from disclosure.

35.     Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information.

36.     Plaintiffs and Class Members relied on Defendant to keep their Private Information, PII, and PHI confidential and securely maintained and to only make authorized disclosures of this information.

**<u>CENTRASTATE'S DATA BREACH AND NOTICE</u>**

37.     Plaintiffs were patients of CentraState. As part of providing medical services, CentraState collected, *inter alia*, Plaintiffs' names, dates of birth, Social Security numbers, addresses, and medical and health insurance information.

38.     According to CentraState, on December 29, 2022, CentraState detected unusual activity on its computer systems through which it eventually learned of unauthorized access that occurred on December 29, 2022 where an unauthorized person obtained a copy of an archived database that stored patient information. Through this "incident," an unauthorized individual or

---

[3] *Id.*

individuals accessed a cache of highly sensitive PII and PHI, including patient names, dates of birth, Social Security numbers, addresses, and medical and health insurance information.

39.    On or about February 8, 2023, CentraState began to notify its patients that its investigation had identified that their Private Information, PII, and PHI had been breached. The Data Breach Notification Letter to Plaintiffs stated that CentraState's "investigation determined that some of your information may have been included in the [stolen] database, such as your name, address, date of birth, Social Security number, health insurance information, medical record number, patient account number, as well as information related to care that you received at CentraState, such as date(s) of service, physician name and department, treatment plan, diagnosis, visit notes, and/or prescription information."

40.    The Data Breach Notification Letter continued with sections entitled "What We Are Doing & What You Can Do" and "For More Information." Other than offering one year of credit monitoring if individuals affirmatively enroll within less than three months after the letter was issued and providing a phone number that victims could call if they "have questions about this incident," CentraState offered no other substantive steps to help victims like Plaintiffs and Class Members to protect themselves, including with regard to their health, medical, and insurance information.

41.    On information and belief, CentraState sent a similar generic letter to all Class Members affected by the Data Breach.

42.    On information and belief, minor children's records were included in the Data Breach.

43.    CentraState's HIPAA privacy policy states that its patients all have "the right to receive notification regarding a breach of your confidential medical information."[4]  It then defines breach as "an impermissible use or disclosure that poses a significant risk of financial, reputational,

---

[4] https://www.centrastate.com/hipaa-privacy-practices/ (last visited Feb. 19, 2023).

or other such harm."[5] However, a breach does not include "an inadvertent disclosure where CentraState has a good faith belief that the unauthorized recipient would not have been able to retain the information."[6] Thus, the fact that CentraState sent a notice to its patients means that it believes that an unauthorized recipient retained Plaintiffs' and Class Members' data, and that such data "poses a significant risk of financial, reputational, or other such harm."

44.    CentraState had obligations created by contract, industry standards, common law, and representations made to Plaintiffs and Class Members to keep their Private Information, PII, and PHI confidential and to protect it from unauthorized access and disclosure.

45.    Plaintiffs and Class Members provided their Private Information to CentraState with the reasonable expectation and mutual understanding that CentraState would comply with its obligations to keep such information confidential and secure from unauthorized access.

46.    Defendant's data security obligations were particularly important given the substantial increase in cyberattacks, especially against hospitals and medical providers in recent years.

47.    Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

### DATA BREACHES IN HEALTHCARE AND THE DISRUPTION THEY CAUSE

48.    According to the Ponemon Institute and Verizon Data Breach Investigations Report, the health industry experiences more data breaches than any other sector.[7] Regular PII can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[8]

---

[5] *Id.*

[6] *Id.*

[7] *Data Breaches: In the Healthcare Sector*, Center for Internet Security, *available at* https://www.cisecurity.org/insights/blog/data-breaches-in-the-healthcare-sector (last visited Feb. 19, 2023).

[8] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends (Oct. 16, 2019), *available at* https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Feb. 19, 2023).

However, PHI can sell for as much as $363 according to the Infosec Institute.[9] This is because one's personal health history cannot be changed unlike credit card information.

49.    PHI has increased value because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can also be used to create fake insurance claims, allowing for the purchase and resale of medical equipment. Some criminals use PHI to illegally gain access to prescriptions for their own use or resale.

50.    Because of the value of its data, the medical industry has experienced disproportionately higher numbers of data theft events than other industries. This is well known in the healthcare industry.

51.    Cyberattacks and data breaches at healthcare providers like CentraState are especially problematic because they can negatively impact the overall daily lives of patients affected by the attack.

52.    Researchers have found that among medical service providers that experience a data security incident, the death rate among patients increased in the months and years after the incident.[10] Researchers have also found that at medical service providers that experienced a data security incident, the incident was associated with an overall deterioration in timeliness and patient outcomes.[11]

## CENTRASTATE FAILED TO COMPLY WITH FTC GUIDELINES

53.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices.

---

[9] *Data Breaches: In the Healthcare Sector*, Center for Internet Security, *available at* https://www.cisecurity.org/insights/blog/data-breaches-in-the-healthcare-sector (last visited Feb. 19, 2023).

[10] *See* Nsikan Akpan, *Ransomware and Data Breaches Linked to Uptick in Fatal Heart Attacks*, PBS (Oct. 24, 2019), https://www.pbs.org/newshour/science/ransomware-and-other-data-breaches-linked-to-uptickin-fatal-heart-attacks (last visited Feb. 19, 2023).

[11] *See* Sung J. Choi, *et al.*, *Data Breach Remediation Efforts and Their Implications for Hospital Quality*, 54 Health Services Research 971, 971-980 (2019). Available at https://onlinelibrary.wiley.com/doi/full/10.1111/1475-6773.13203 (last visited Feb. 19, 2023).

According to the FTC, the need for data security should be factored into all business decision-making.

54.    In October 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

55.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.

56.    The FTC has brought enforcement actions against entities for failing to adequately and reasonably protect data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

57.    On information and belief, CentraState failed to properly implement basic data security practices. CentraState's failure to employ reasonable and appropriate measures to protect against unauthorized access to PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

58.    CentraState was at all times fully aware of its obligation to protect the PII and PHI of its patients.

59.    CentraState knew or should have known of the risks it faced as a medical provider and should have strengthen its data systems accordingly. CentraState was put on notice of the substantial and foreseeable risk of harm from a data breach yet it failed to properly prepare for that risk.

## CENTRASTATE FAILED TO COMPLY WITH INDUSTRY STANDARDS

60.    As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

61.    Some industry best practices that should be implemented by entities like CentraState, include but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. Upon information and belief, Defendant failed to follow some or all of these industry best practices.

62.    Other best cybersecurity practices that are standard in the industry include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. Upon information and belief, Defendant failed to follow these cybersecurity best practices, including failure to train its staff.

63.    Upon information and belief, Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-

2), the HIPAA Security Rule and Breach Notification Rule, and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness. Upon information and belief, Defendant failed to comply with these accepted standards, thereby opening the door to the cyber incident and causing the Data Breach.

## CENTRASTATE'S SECURITY OBLIGATIONS AND ITS VIOLATIONS OF HIPAA

64.    CentraState breached its obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data.

65.    HIPAA requires covered entities to protect against reasonably anticipated threats to the security of sensitive patient health information. Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.

66.    Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling the types of data that Defendant left unguarded. The HHS subsequently promulgated multiple regulations.

67.    Cyberattacks are considered a breach under the HIPAA Rules because a breach under the HIPAA Rules is defined as "the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rules] which compromises the security or privacy of the PHI." 45 C.F.R. 164.40.10.

68.    CentraState's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

        a.    Failing to maintain an adequate data security system to reduce the risk of data breaches and cyberattacks;

        b.    Failing to adequately protect its patients' Private Information;

    c.   Failing to properly monitor its own data security systems for existing intrusions;

    d.   Failing to sufficiently train its employees regarding the proper handling of PII and PHI;

    e.   Failing to fully comply with FTC guidelines for cybersecurity in violation of Section 5 of the FTC Act;

    f.   Failing to ensure compliance with HIPAA security standard rules by its workforce in violation of 45 C.F.R. § 164.306(a)(4);

    g.   Failing to render the electronic PHI it maintained into unusable, unreadable, or indecipherable form to unauthorized individuals, as it had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR § 164.304's definition of "encryption"); and

    h.   Failing to adhere to industry standards for cybersecurity.

69.    Upon information and belief, as a result of computer systems in need of security upgrades, inadequate procedures for handling emails containing viruses or other malignant computer code, and/or employees who opened files containing the virus or malignant code that perpetrated the cyberattack, CentraState negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information.

70.    On information and belief, the Data Breach resulted from a combination of insufficiencies that demonstrate that CentraState failed to comply with safeguards mandated by HIPAA regulations.

71.    Accordingly, as outlined below, Plaintiffs' and Class Members' lives were severely disrupted. What's more, they now face an increased risk of fraud and identity theft. Plaintiffs and Class Members also lost the benefit of the bargain they made with CentraState.

## DATA BREACHES, FRAUD, AND IDENTITY THEFT

72.    The FTC hosted a workshop to discuss "informational injuries" which are injuries that consumers suffer from privacy and security incidents, such as data breaches or unauthorized disclosure of data.[12] Exposure of personal information that a consumer wishes to keep private may cause both market and non-market harm to the consumer, such as the ability to obtain or keep employment. Consumers' loss of trust in e-commerce also deprives them of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

73.    Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason why criminals steal information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

74.    The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to

---

[12] *FTC Information Injury Workshop, BE and BCP Staff Perspective,* Federal Trade Commission, (October 2018), *available at* https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf (last visited Feb. 19, 2023).

remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[13]

75.    Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

76.    Identity thieves can also use Social Security numbers to obtain an official identification card in the victim's name but with the thief's picture, use the victim's name and Social Security number to obtain government benefits, or file a fraudulent tax return using the victim's information. In addition, identity thieves may receive medical services in the victim's name, rent a house, or and even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

77.    A study by the Identity Theft Resource Center[14] shows the multitude of harms caused by fraudulent use of PII:



---

[13] See IdentityTheft.gov, Federal Trade Commission, available at https://www.identitytheft.gov/Steps (last visited Feb. 19, 2023).

[14] Steele, Jason, Credit Card and ID Theft Statistics, CreditCards.com (October 23, 2017), available at https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276/ (last visited Feb. 19, 2023).

78.     Moreover, the value of Private Information is axiomatic. The consequences of cyberthefts include heavy prison sentences. The fact that identity thieves attempt to steal identities notwithstanding these possible heavy prison sentences illustrates beyond a doubt that Private Information has considerable market value.

79.     Theft of medical-related PHI is particularly troubling and can result in medical identity theft, where a thief uses the victim's information to see a doctor, get prescription drugs, buy medical devices, submit insurance claims, or get other medical care.[15] If the thief's health information is mixed with the victim's health information, it can negatively impact the victim's health insurance benefits and credit.

80.     Drug manufacturers, medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase PII and PHI on the black market for the purpose of target marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully-disclosed PHI to adjust their insureds' medical insurance premiums.

81.     It must also be noted that there may be a substantial time lag between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:[16]

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

---

[15] *What To Know About Medical Identity Theft*, Federal Trade Commission (May 2021), *available at* https://consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last visited Feb. 19, 2023).

[16] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (June 2007), *available at* https://www.gao.gov/assets/270/262904.html (last visited Feb. 19, 2023).

82.    Private Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black market" for years.

83.    As a result, there is a strong probability that entire batches of stolen information have yet to be dumped on the black market, meaning that Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiffs and Class Members have no choice but to vigilantly monitor their accounts for many years to come.

## PLAINTIFFS' AND CLASS MEMBERS' DAMAGES

84.    Plaintiffs and Class Members have been damaged by the compromise of their Private Information, PII, and PHI in the Data Breach.

85.    Plaintiffs' Private Information, including sensitive PII and PHI, was compromised as a direct and proximate result of the Data Breach.

86.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered an imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

87.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been forced to expend time dealing with the effects of the Data Breach.

88.    Plaintiffs and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

89.    Plaintiffs and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information, as potential fraudsters could use that information to target their schemes at Plaintiffs and Class Members.

90.    Plaintiffs and Class Members also face substantial risk of being victims of medical identity theft.

91.     Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

92.     The information that Defendant maintains regarding Plaintiffs and Class Members combined with publicly available information allows nefarious actors to assemble a detailed picture of Plaintiffs and Class Members.

93.     Plaintiffs and Class Members were also damaged via benefit-of-the-bargain damages. Plaintiffs and Class Members overpaid for a service that was intended to be accompanied by adequate data security but was not. Part of the price Plaintiffs and Class Members paid to CentraState was intended to be used by CentraState to fund adequate security of CentraState's data and protect Plaintiffs' and Class Members' Private Information. Thus, Plaintiffs and the Class Members did not get what they paid for.

94.     Plaintiffs and Class Members have spent and will continue to spend significant amounts of time to monitor their accounts and records for misuse.

95.     Plaintiffs and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered of will suffer ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

      a.  Finding fraudulent charges;

      b.  Canceling and reissuing credit and debit cards;

      c.  Purchasing credit monitoring and identity theft prevention;

      d.  Placing "freezes" and "alerts" with credit reporting agencies;

      e.  Spending time on the phone with or at a financial institution to dispute fraudulent charges;

      f.  Contacting financial institutions and closing or modifying financial accounts; and

19

g.  Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

96.    Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to making sure that the storage of data or documents containing PII and PHI is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

97.    As a direct and proximate result of Defendant's actions and inactions, Plaintiffs and Class Members have suffered a loss of privacy and either have suffered harm or are at an increased risk of future harm.

## CLASS ALLEGATIONS

98.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and on behalf of all other persons similarly situated (the "Class").

99.    Plaintiffs propose the following Class definitions, subject to amendment as appropriate:

**Nationwide Class**

All individuals in the United States who had Private Information stolen as a result of the Data Breach, including all who were sent a notice of the Data Breach.

**New Jersey Subclass**

All residents of New Jersey who had Private Information stolen as a result of the Data Breach, including all who were sent a notice of the Data Breach.

100.    Excluded from each of the above proposed classes are Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors,

affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded are any judge to whom this case is assigned as well as their judicial staff and immediate family members.

101.    Plaintiffs reserve the right to modify or amend the definitions of the proposed classes before the Court determines whether certification is appropriate.

102.    Each of the proposed classes meet the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

103.    <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, based on information and belief, the Class consists of approximately 617,000 patients whose data was compromised in the Data Breach. The identities of Class Members are ascertainable through Defendant's records, Class Members' records, publication notice, self-identification, and other means.

104.    <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a.  Whether Defendant engaged in the conduct alleged herein;

    b.  Whether Defendant's conduct violated the New Jersey Consumer Fraud Act (NJCFA), invoked below;

    c.  Whether Defendant's response to the Data Breach was adequate;

    d.  Whether Defendant unlawfully lost or disclosed Plaintiffs' and Class Members' Private Information;

    e.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    f.  Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

g. Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

h. Whether Defendant owed a duty to Class Members to safeguard their Private Information;

i. Whether Defendant breached its duty to Class Members to safeguard their Private Information;

j. Whether hackers obtained Class Members' Private Information via the Data Breach;

k. Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

l. What damages Plaintiffs and Class Members suffered as a result of Defendant's misconduct;

m. Whether Defendant's conduct was negligent;

n. Whether Defendant's conduct was *per se* negligent;

o. Whether Defendant was unjustly enriched;

p. Whether Plaintiffs and Class Members are entitled to actual and/or statutory damages;

q. Whether Plaintiffs and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

r. Whether Plaintiffs and the Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

105. <u>Typicality</u>. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class Member, was compromised in the Data Breach.

106.    <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately represent and protect the interests of Class Members. Plaintiffs' Counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

107.    <u>Predominance</u>. CentraState have engaged in a common course of conduct toward Plaintiffs and Class Members in that all of Plaintiffs' and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

108.    <u>Superiority</u>. A Class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

109.    Class certification also is appropriate under Fed. R. Civ. P. 23(b)(2). Defendant has acted or has refused to act on grounds generally applicable to the Class so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

110.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to the names and addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE
### (ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS OR ALTERNATIVELY THE NEW JERSEY STATE SUBCLASS)

111.    Plaintiffs restate and reallege all of the allegations stated above and hereafter as if fully set forth herein.

112.    Defendant knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' Private Information, PII, and PHI, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

113.    Defendant knew or should have known of the risks inherent in collecting the Private Information, PII, and PHI of Plaintiffs and Class Members and the importance of adequate security. Defendant was on notice because it knew or should have known that it would be an attractive target for cyberattacks.

114.    Defendant owed a duty of care to Plaintiffs and Class Members whose Private Information was entrusted to it as a result of the special relationship between Defendant and its patients recognized by laws and regulations, including but not limited to HIPAA, as well as common law. Defendant's duties included, but were not limited to, the following:

    a.    To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information, PII, and PHI in its possession;

    b.    To protect Private Information, PII, and PHI using reasonable and adequate security procedures and systems that are compliant with industry standards;

    c.    To have procedures in place to prevent the loss or unauthorized dissemination of Private Information, PII, and PHI in its possession;

    d.   To employ reasonable security measures and otherwise protect the Private Information, PII, and PHI of Plaintiffs and Class Members pursuant to the NJCFA and HIPAA;

    e.   To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

    f.   To promptly notify Plaintiffs and Class Members of the Data Breach, and to precisely disclose precisely the type(s) of information compromised.

115.   Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1).

116.   Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant was bound by industry standards to protect confidential Private Information.

117.   Plaintiffs and Class Members were foreseeable victims of any inadequate security practices on the part of Defendant, and Defendant owed them a duty of care to not subject them to an unreasonable risk of harm. It was reasonably foreseeable that Defendant's failure to utilize adequate security measures to protect Class Members' Private Information would result in injury to Class Members. The Data Breach was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry, as discussed above.

118.   Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' Private Information, PII, and PHI within Defendant's possession.

119.   Defendant, by its actions and/or omissions, breached its duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information, PII, and PHI of Plaintiffs and Class Members.

120.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information, PII, and PHI. On information and belief, the specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

      a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information, PII, and PHI;

      b.  Failing to adequately monitor the security of its networks and systems;

      c.  Failing to periodically ensure that its email system maintained reasonable data security safeguards; and

      d.  Allowing unauthorized access to Class Members' Private Information, PII, and PHI.

121.    Plaintiffs' and Class Members' willingness to entrust Defendant with their Private Information, PII, and PHI was predicated on the understanding that Defendant would take adequate security precautions. Moreover, only Defendant had the ability to protect its systems (and the Private Information that it stored on them) from attack.

122.    Defendant's breach of duties owed to Plaintiffs and Class Members caused Plaintiffs' and Class Members' Private Information, PII, and PHI to be compromised.

123.    As a result of CentraState's ongoing failure to notify Plaintiffs and Class Members regarding exactly what Private Information has been compromised, *i.e.*, only saying in the Data Breach Notification Letter that "some of your information *may* have been included" (emphasis added), Plaintiffs and Class Members have been unable to take the necessary precautions to prevent future fraud and mitigate damages.

124.    Defendant's breaches of duty caused a foreseeable risk to Plaintiffs and Class Members that they would be harmed by suffering from identity theft, loss of control over their Private Information, and/or loss of time and money to monitor their accounts for fraud.

125.    As a result of Defendant's negligence and breach of duties, Plaintiffs and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

126.    Defendant also had independent duties under New Jersey state law (including the NJCFA) and under HIPAA that required it to reasonably safeguard Plaintiff's and Class Members' Private Information, PII, and PHI.

127.    As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and Class Members have suffered damages and are at imminent risk of further harm.

128.    The injury and harm that Plaintiffs and Class Members suffered was reasonably foreseeable.

129.    The injury and harm that Plaintiffs and Class Members suffered was the direct and proximate result of Defendant's negligent conduct.

130.    Plaintiffs and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

131.    In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, inter alia, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

**COUNT II**
**NEGLIGENCE *PER SE***
**(ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS OR**
**ALTERNATIVELY THE NEW JERSEY STATE SUBCLASS)**

132.    Plaintiffs restate and reallege the allegations in paragraphs 1-110 as if fully set forth herein.

133.    Pursuant to Section 5 of the FTCA, Defendant had a duty to provide fair and adequate computer systems and data security to safeguard Plaintiffs' and Class Members' Private Information, PII, and PHI.

134.    Pursuant to HIPAA, Defendant had a duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' PHI.

135.    Under HIPAA, Defendant had a duty to render electronic PHI into unusable, unreadable, or indecipherable form. *See* 45 C.F.R. § 164.304.

136.    Defendant breached its duties by failing to employ industry-standard cybersecurity measures in order to comply with the FTCA and its obligations under HIPAA, including but not limited to: proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

137.    Plaintiffs and Class Members are within the class of persons that the FTCA and HIPAA intend to protect.

138.    The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect Private Information. The FTC publications described above and the industry-standard cybersecurity measures also form part of the basis of Defendant's duty in this regard.

139.    Defendant violated the FTCA and HIPAA by failing to use reasonable measures to protect the Private Information of Plaintiffs and Class Members and by not complying with applicable industry standards, as described herein.

140.    It was reasonably foreseeable, particularly given the growing number of data breaches of Private Information within the medical industry, that the failure to reasonably protect and secure Plaintiffs' and Class Members' Private Information, PII, and PHI in compliance with applicable laws would result in an unauthorized third-party gaining access to Defendant's networks, databases, and computers that stored or contained Plaintiffs' and Class Members' Private Information.

141.    Defendant's violations of the FTCA and HIPAA constitute negligence per se.

142.    Plaintiffs' and Class Members' Private Information, PII, and PHI constitute personal property that was stolen due to Defendant's negligence, resulting in harm, injury, and damages to Plaintiffs and Class Members.

143.    As a direct and proximate result of Defendant's negligence per se, Plaintiffs and the Class have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their Private Information (including PII and PHI) because of the Data Breach, including but not limited to damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives.

144.    Defendant breached its duties to Plaintiffs and the Class under these laws by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information, PII, and PHI.

145.    As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

146.    In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, inter alia, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

**COUNT III**
**BREACH OF CONTRACT**
**(ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS OR**
**ALTERNATIVELY THE NEW JERSEY STATE SUBCLASS)**

147.    Plaintiffs restate and reallege the allegations in paragraphs 1-110 as if fully set forth herein.

148.    Plaintiffs and Class Members entered into a valid and enforceable contract through which Defendant provided services to Plaintiffs and Class Members. That contract included promises by Defendant to secure, safeguard, and not disclose Plaintiffs' and Class Members' Private Information.

149.    Defendant's Privacy Policy memorialized the rights and obligations of Defendant and its patients. Each patient is obligated to execute a copy of the Privacy Policy in order to receive services from CentraState, and in return patients are promised certain assurances regarding the use

and security of their data. In fact, as part of its Privacy Policy, Defendant explicitly commits to protecting the privacy and security of personal information and promises to never share such information except under specified circumstances.

150.    Defendant promised to comply with all HIPAA standards, state and federal law, to ensure that Plaintiffs' and Class Members' PHI was protected, secured, kept private, and not disclosed.

151.    Plaintiffs and Class Members fully performed their obligations under their contracts with Defendant.

152.    However, Defendant did not secure, safeguard, and/or keep private Plaintiffs' and Class Members' PII and PHI, and therefore Defendant breached its contract with Plaintiffs and Class Members.

153.    Defendant allowed third parties to access, copy, and/or transfer Plaintiffs' and Class Members' PII and PHI without permission. Therefore, Defendant breached the Privacy Policy with Plaintiffs and Class Members.

154.    Defendant's failure to satisfy its confidentiality and privacy obligations resulted in Defendant providing services to Plaintiffs and Class Members that were of a diminished value.

155.    As a result, Plaintiffs and Class Members have been harmed, damaged, and/or injured as described herein.

156.    In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

**COUNT IV**
**BREACH OF IMPLIED CONTRACT**
**(ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS OR**
**ALTERNATIVELY THE NEW JERSEY STATE SUBCLASS)**

157.    Plaintiffs restate and reallege the allegations in paragraphs 1-110 as if fully set forth herein.

158.    This Count is pleaded in the alternative to Count III above.

159.    Defendant provides medical services to Plaintiffs and Class Members. Plaintiffs and Class Members formed an implied contract with Defendant regarding the provision of those services through their collective conduct.

160.    Through Defendant's provision of services, it knew or should have known that it must protect Plaintiffs' and Class Members' confidential Private Information, PII, and PHI in accordance with Defendant's policies, practices, and applicable law, including the FTCA, the NJCFA, and HIPAA.

161.    As part of receiving services, Plaintiffs and Class Members turned over valuable PII and PHI to Defendant. Accordingly, Plaintiffs and Class Members bargained with Defendant to securely maintain and store their Private Information.

162.    Defendant violated these implied contracts by failing to employ reasonable and adequate security measures to secure Plaintiffs' and Class Members' Private Information.

163.    Plaintiffs and Class Members have been damaged by Defendant's conduct, including by incurring the harms and injuries arising from the Data Breach now and in the future.

**COUNT V**
**VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT**
**(ON BEHALF OF PLAINTIFFS AND THE NEW JERSEY STATE SUBCLASS)**

164.    Plaintiffs restate and reallege the allegations in paragraphs 1-110 as if fully set forth herein.

165.    The NJCFA makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise,

misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J. Stat. Ann. § 56:8-2.

166.    Defendant committed unfair or deceptive acts and practices by failing to maintain adequate computer systems and data security practices to safeguard PHI and PII and by failing to disclose that its computer systems and data security practices were inadequate to safeguard PHI and PII from theft. These unfair acts and practices violated duties imposed by the NJCFA. These deceptive acts and practices were directed at New Jersey consumers.

167.    The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the character of the services provided, specifically as to the safety and security of PHI, PII, and other Private Information, to induce consumers to receive medical care at CentraState.

168.    Defendant's unconscionable commercial practices, false promises, misrepresentations, and omissions set forth herein are material in that they relate to matters which reasonable persons, including Plaintiffs and Class Members, would attach importance to in selecting a medical provider.

169.    Plaintiffs and members of the New Jersey State Subclass are New Jersey consumers who utilized CentraState for medical services.

170.    Defendant's acts, practices, and omissions were done in the course of Defendant's marketing and furnishing medical services to Plaintiffs and members of the New Jersey State Subclass.

171.    Plaintiffs and Class Members were injured because they would not have agreed to receive medical care from CentraState had they known the true nature and character of Defendant's data security practices, they would not have entrusted their PHI and PII to Defendant in the absence of promises that Defendant would keep their information reasonably secure, and they would not

have entrusted their PHI and PII to Defendant in the absence of a promise to monitor computer systems and networks and assurance that it had adopted reasonable data security measures.

172.    Plaintiffs and Class Members have been damaged by Defendant's conduct, including by incurring the harms and injuries arising from the Data Breach now and in the future.

173.    In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

174.    Plaintiffs are entitled to recover legal and/or equitable relief, including an order enjoining Defendant's unlawful conduct, treble damages, costs, and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19, along with any other appropriate relief.

**COUNT VI**
**UNJUST ENRICHMENT**
**(ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS OR ALTERNATIVELY THE NEW JERSEY STATE SUBCLASS)**

175.    Plaintiffs restate and reallege the allegations in paragraphs 1-110 as if fully set forth herein.

176.    This count is pleaded in the alternative to Counts III and IV above.

177.    Plaintiffs and Class Members conferred a benefit on Defendant by paying for services that should have included data and cybersecurity protection to protect their Private Information, which Plaintiffs and Class Members did not receive.

178.    Defendant has retained the benefits of its unlawful conduct including the amounts received for data and cybersecurity practices that it did not provide. Due to Defendant's conduct alleged herein, it would be unjust and inequitable under the circumstances for Defendant to be permitted to retain the benefit of its wrongful conduct.

179.    Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendant, and/or an order of this Court proportionally disgorging all profits,

benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by establishing a constructive trust from which Plaintiffs and Class Members may seek restitution or compensation may be created.

180.    Plaintiffs and Class Members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

### COUNT VII
### DECLARATORY JUDGMENT
### (ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS OR ALTERNATIVELY THE NEW JERSEY STATE SUBCLASS)

181.    Plaintiffs restate and reallege the allegations in paragraphs 1-110 as if fully set forth herein.

182.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

183.    Defendant owes a duty of care to Plaintiffs and Class Members, which required it to adequately secure Private Information.

184.    Defendant still possesses PHI, PII, and Private Information regarding Plaintiffs and Class Members.

185.    Plaintiffs allege that Defendant's data security measures remain inadequate. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of their PHI, PII, and Private Information and the risk remains that further compromises of their PHI, PII, and Private Information will occur in the future.

186.    Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owes a legal duty to secure its patients' Private Information under the common law and Section 5 of the FTCA;

b. Defendant's existing security measures do not comply with its explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect Private Information; and

c. Defendant continues to breach this legal duty by failing to employ reasonable measures to secure its patients' Private Information.

187.    This Court should also issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with legal and industry standards to protect its patients' Private Information, including the following:

a. Order Defendant to provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

b. Order that to comply with Defendant's explicit or implicit contractual obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

i. engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

ii. engaging third-party security auditors and internal personnel to run automated security monitoring;

iii. auditing, testing, and training its security personnel regarding any new or modified procedures;

    iv.  segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendant's systems;

    v.  conducting regular database scanning and security checks;

    vi.  routinely and continually conducting training and education to inform security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

    vii.  meaningfully educating its patients about the threats they face with regard to the security of their Private Information, PII, and PHI, as well as the steps Defendant's patients must take to protect themselves.

188.    If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury and lack an adequate legal remedy to prevent another data breach. The risk of another such breach is real, immediate, and substantial. If another breach occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

189.    The hardship to Plaintiffs and Class Members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Plaintiffs and Class Members will likely be subjected to substantial identity theft, medical identity theft, and other related damages. On the other hand, the cost of Defendant's compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

190.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach at Defendant, thus preventing future injury to Plaintiffs and Class Members whose Private Information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Classes described above, seek the following relief:

a. An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining the Classes as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representatives of the Classes requested herein;

b. Judgment in favor of Plaintiffs and Class Members, awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

c. An order providing injunctive and other equitable relief as necessary to protect the interests of the Classes as requested herein;

d. An order instructing Defendant to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members;

e. An order requiring Defendant to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f. A judgment in favor of Plaintiffs and Class Members, awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g. An award of such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all triable issues.

DATED:  February 21, 2023          Respectfully submitted,

/s/ Thomas Stavola Jr.

**SIRI & GLIMSTAD LLP**
Mason A. Barney (*pro hac vice* to be filed)
Steven D. Cohen (N.J. Bar No. 038172009)
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: mbarney@sirillp.com
E: scohen@sirillp.com

Thomas Stavola Jr. (N.J. Bar No. 380012022)
8 Campus Drive, Suite 105 PMB #161
Parsippany, NJ 07054
Tel: (212) 532-1091
E: tstavola@sirillp.com

*Counsel for Plaintiffs and the Proposed Class*